# AFFIDAVIT IN SUPPORT OF AN
# APPLICATION UNDER RULE 41 FOR A
# WARRANT TO SEARCH AND SEIZE

I, Christopher C. Walker, a Federal Agent with the United States Border Patrol being duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.  I am a Border Patrol Agent with the United States Border Patrol (USBP) in Tucson, Arizona.  I have been employed as a Border Patrol Agent with the USBP since November 3, 2008.  I completed the United States Border Patrol Academy on March 26, 2009.  I received further training in the detection, interdiction, and arrest of narcotics smugglers, alien smugglers, and aliens illegally present in the United States.  During my career as a Border Patrol Agent, I have arrested numerous violators of immigration law and federal statutes.

2.  Since October 2019, I have assigned to the Tucson Border Patrol Station Border Apprehension and Interdiction Team (BAIT).  BAIT is primarily a plain clothes unit tasked with investigating, arresting, prosecuting and gathering intelligence on alien and narcotic smuggling organizations and their members that utilize southern and central Arizona. During my time on this unit, I have conducted numerous interviews with subjects arrested for alien smuggling. Based on these interviews and subsequent consensual searches and warrant granted searches of subject's electronic devices, I have observed almost all communication is done electronically.  These communications take place via text message, phone calls, social media application or other internet-based messaging applications.  I perform records checks through the use of multiple law enforcement and public databases in order to establish the accuracy of information, and further gather facts relevant to a case

3.  I was assigned to the Tucson Border Patrol Station Highway Interdiction Team (HIT) from

January 2019 to October 2019, which is a unit that operates in support of Border Patrol operations at the Tucson Border Patrol Station.   HIT is tasked with the responsibility of investigating, arresting, and prosecuting alien and narcotics smuggling organizations and their members that utilize the Southern and Central Districts of Arizona. While assigned to HIT, I routinely conducted interviews with narcotics smugglers, alien smugglers, and illegal aliens.  Based on these interviews and subsequent consensual searches and warrant granted searches of subject's electronic devices, I have observed almost all communication is done electronically.   These communications take places via text message, phone calls, social media application or other internet-based messaging applications.  I perform records checks through the use of multiple law enforcement and public databases in order to establish the accuracy of information, and further gather facts relevant to a case.

4.     Based on my training, experience and participation in other investigations involving narcotics and alien smuggling, I know that smugglers regularly utilize cellular telephones and other electronic devices to communicate when conducting their illegal activity.   These devices are utilized in furtherance of the crime by determining the pick-up and drop-off locations of the vehicles used to smuggle narcotics and/or aliens, communications between the load drivers and the scout drivers, as well as photographing members of the conspiracy and collecting proceeds derived from this unlawful activity.

5.     The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents and my experience and background as a Border Patrol Agent in the United States Border Patrol. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe that the

suspects/defendants in this case employed the use of their personal cellular phones prior to and during the commission of the alien smuggling offense.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

6.   The property to be searched consists of two cellular telephones:

    a.   One Grey I-Phone, seized from Jon Christian SCHACHT ("Phone 1").

    b.   One Black I-Phone, seized from Selena Alicia ACOSTA ("Phone 2")

The I-Phones are currently in the physical custody of Customs and Border Protection and located in the Border Patrol Tucson Station Evidence Room.

## PROBABLE CAUSE

7.   On Tuesday, February 15, 2022, Border Patrol Agents observed two vehicles, a white 2008 Dodge Charger (AZ license plate H9A6PG) and a silver 2019 Toyota Camry (AZ license plate GOLDR5H) traveling in tandem in the Town of Arivaca, AZ.   Arivaca is a small, sparsely populated rural community approximately 12 miles north of the international border with Mexico.   Due to its proximity to the border Arivaca experiences a lot of illegal alien and narcotic smuggling activity.   The vehicles were observed travelling eastbound down a dirt road in an area commonly used to pick up illegal aliens.   The vehicles were then observed traveling westbound a short time later, again in tandem. These vehicles stood out because they are not the type of vehicles typically seen in the area for legitimate reasons. Due to the poor road conditions most locals drive high clearance, four-wheel drive vehicles like pickup trucks or SUVs.

8.   The vehicles were stopped by Border Patrol Agents near Milepost 14 on West Arivaca Road.   This road connects Arivaca, AZ to Interstate-19 and is a common route for smugglers

to move illegal aliens into the interior of the country. Jon Christian SCHACHT was driving the Charger, which was also occupied by one Mexican citizen, Saul GARCIA-CRUZ. GARCIA-CRUZ does not have any documents allowing him to be present in the United States and admitted to crossing the border illegally. The Charger was registered to Selena Alicia ACOSTA. Meanwhile, ACOSTA was driving the Camry, which was registered to SCHACHT. There were no other occupants in the Camry. SCHACHT and ACOSTA were both taken into custody for conspiracy to smuggle illegal aliens.

9.     ACOSTA was read her Miranda rights and declined to speak with agents. SCHACHT was read his Miranda rights and agreed to speak with agents without a lawyer present.

10.    During the interview SCHACHT admitted to being sent GPS coordinates to the pickup location on his phone by a friend named Scott McAdams. Agents also noticed while in custody SCHACHT received several voice calls via WhatsApp from a Mexican phone number (+52 662-153-1323). Alien smuggling is often coordinated by subjects in Mexico. SCHACHT was also receiving messages via WhatsApp, which is an encrypted messaging application commonly used by alien smugglers. SCHACHT also admitted to communicating to ACOSTA on his phone that day.

11.    Agents noticed that while in custody ACOSTA had also received a voice call via WhatsApp from the same Mexican phone number (+52 662-153-1323). She also had several text messages via WhatsApp.

12.    SCHACHT has had multiple encounters with Border Patrol Agents where his vehicle was observed in close proximity to a vehicle that was smuggling illegal aliens.

13.    On February 9, 2022, Border Patrol Agents assigned to Tucson Station observed SCHACHT's Camry traveling directly behind a blue 2006 Honda Accord (AZ paper license

plate 3KA83F) suspected of alien smuggling.  When agents got close to the two vehicles in an attempt to stop the Accord, SCHACHT flashed the high beams of his Camry alerting the Accord of the agents' presence.  Shortly after, the Accord pulled over to the side of the road and several subject wearing camouflage clothing exited the vehicle and absconded into the desert.  Agents were able to take the driver of the Accord into custody along with a Guatemalan citizen who did not have legal authorization to be in the United States.

14.     Also on February 9, 2022, at the same time agents stopped the Accord, SCHACHT was stopped in his Camry, near Milepost (MP) 20 West Arivaca Road, SCHACHT claimed to be coming from visiting his friend in Arivaca.  SCHACHT claimed to not know the driver of the Accord even though he had been observed traveling directly behind the Accord multiple times. SCHACHT was initially observed at 9:00 p.m. traveling west through the Arivaca Border Patrol Checkpoint located at MP 22 West Arivaca Road near Amado, AZ.  At approximately 10:05 p.m. is when agent stopped SCHACHT.  Google Maps estimates this journey should take approximately 55 minutes.  That would mean SCHACHT would have only visited his friend for approximately 10 minutes.  SCHACHT's residence in Tucson, AZ is approximately 146 miles round trip, which would take about 3 hours to drive to where he claimed his friend lives and back.

15.     During the February 16, 2022, interview, SCHACHT was asked about his encounter with Border Patrol Agents on February 9, 2022, and he claimed to have been picking up a Sony PlayStation video game controller.  During this interview SCHACHT was unable to give the exact location of his friend's residence, only the general area.   SCHACHT claimed this was because he is not really friends the person, he is just an acquaintance he worked with at a former job.

16.     Based on these two encounters, there is probable cause to believe that SCHACHT and

ACOSTA were involved in a conspiracy to smuggle illegal aliens in violation of 8 USC §

1324 and that the above listed **Phones 1 & 2** were used in the commission of the conspiracy

and contain evidence thereof.

### TECHNICAL TERMS

17.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

a) Wireless telephone: A wireless telephone (or mobile telephone or cellular

telephone) is a handheld wireless device used for voice and data

communication through radio signals. These telephones send signals through

networks of transmitter/receivers, enabling communication with other wireless

telephones or traditional "land line" telephones. A wireless telephone usually

contains a "call log," which records the telephone number, date and time of

calls made to and from the phone. In addition to enabling voice

communications, wireless telephones offer a broad range of capabilities. These

capabilities include: storing names and phone numbers in electronic "address

books;" sending, receiving and storing text messages and e-mail; taking,

sending, receiving, and storing still photographs and moving video; storing and

playing back audio files; storing dates, appointments and other information on

personal calendars; and accessing and downloading information from the

Internet.   Wireless telephones may also include global positioning system

("GPS") technology for determining the location of the device.

b) Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

c) Portable media player. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

d) Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

14.    In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

15.    Based on my knowledge, training, and experience, I know that electronic devices such as **Phones 1 & 2** in this case, can store information for long periods of time.  Similarly, things that have been viewed via or uploaded to the Internet are typically stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person

"deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

16.     As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Phones 1 & 2** were used, where it was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be on **Phones 1 & 2** as more fully set forth in the factual section contained herein and because:

A. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

B. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of device did not have a relationship with the party.

17.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Phones 1 & 2** consistent with the warrant.  The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of **Phones 1 & 2** to human inspection in order to determine whether it is evidence described by the warrant.

18.     If **Phones 1 & 2** are damaged beyond repair, password protected or otherwise inoperable, less invasive data analysis techniques will not accomplish the forensic goals of the examination.  If this is true, an analysis technique referred to as

"chip off" may be implemented to conduct the data extraction process. Chip-off is an advanced digital data extraction and analysis technique that would involve physically removing flash memory chip(s) from **Phones 1 & 2** and then acquiring the raw data using specialized equipment. This process would render **Phones 1 & 2** unusable.

19.     Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

20.     Based on the foregoing information, there is probable cause to believe that **Phones 1 & 2** contain evidence related to violations of 8 U.S.C. § 1324. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Phones 1 & 2** described in Attachment A to seek the items described in Attachment B.

Christopher C. Walker
Border Patrol Agent, Affiant

Electronically Submitted and Sworn to telephonically this
23rd  day of February, 2022

Honorable Jacqueline M. Rateau
United States Magistrate Judge

## ATTACHMENT A

The property to be searched consists of two cellular telephones:

    a.  One Grey I-Phone, seized from Jon Christian SCHACHT ("Phone 1").

    b.  One Black I-Phone, seized from Selena Alicia ACOSTA ("Phone 2")

Because I-Phones require entry into the phone to obtain the IMEI number, those numbers are not accessible at this time. The items are currently in the physical custody of Customs and Border Protection and located in the Border Patrol Tucson Station Evidence Room. This warrant authorizes the forensic examination of the phones for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.  Data and/or digital files stored on or accessed through the Phones 1 & 2 (as described in Attachment A) relating to alien smuggling, wherever it may be stored or found, including:

    a.  lists of co-conspirators/aliens being smuggled and related identifying information;

    b.  financial details related to the alien smuggling such as amounts paid as well as dates, places, and amounts of specific transactions;

    c.  electronic correspondence stored on or accessed through the Phone relating to alien smuggling, to include emails and attached files, text messages, and instant messaging logs;

    d.  information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the Phone;

    e.  contact lists stored on or accessed through the Phone, to include telephone and email contact names, telephone numbers, addresses, and email addresses;

    f.  evidence of persons who used, owned, or controlled the Phone;

    g.  logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through the Phone;

    h.  evidence related to the historical location of the Phone;

    i.  social media accounts, apps, and programs accessed through the Phone.